729 S.E.2d 137

**Joe E. MILLER, Commissioner of the West Virginia Division of Motor Vehicles, Defendant Below, Petitioner**

v.

**Christopher L. TOLER, Plaintiff Below, Respondent.**

No. 11–0352.

Supreme Court of Appeals of West Virginia.

Submitted April 11, 2012.

Decided June 6, 2012.

Dissenting Opinion of Justice Benjamin July 20, 2012.

WORKMAN, Justice:

This case is before the Court upon the appeal of the Petitioner Joe Miller, Commissioner of the West Virginia Division of Motor Vehicles (hereinafter "the Commissioner"), from an Order of the Circuit Court of Mercer County, West Virginia, reversing the Commissioner's revocation of the Respondent Christopher L. Toler's driver's license. The circuit court found that the Respondent was driving while under the influence of alcohol; however, because the circuit court also found that the vehicle equipment checkpoint at which the Respondent was stopped was unconstitutional, the Commissioner's decision to revoke the Respondent's license was reversed. The Commissioner argues that the circuit court erred: 1) in applying the prophylactic exclusionary rule to exclude all evidence in this case because the judicially-created exclusionary rule does not apply to civil proceedings; and 2) in excluding all the evidence because West Virginia § 17C–5A–2(f) (2008) [1] creates only a limited exclusionary rule that requires the suppression of secondary breath test evidence if administered without lawful custody, but does not otherwise bar the admission of other evidence.[2]

## I. Factual and Procedural Background

On December 28, 2008, Senior Trooper C.N. Workman and three or four other State Police Officers conducted a vehicle equipment checkpoint on State Route 71, near Montcalm, Mercer County, West Virginia. The purpose of the checkpoint was to check license, registration, insurance, and brake lights. At the checkpoint, Senior Trooper Workman asked the Respondent for his license, registration and insurance card. The trooper walked back to inspect the Respondent's registration and brake lights. Upon returning the Respondent's license and regis-

Darrell V. McGraw, Esq., Attorney General, Scott E. Johnson, Esq., Senior Assistant Attorney General, Elaine L. Skorich, Esq., Assistant Attorney General, Charleston, WV, for the Petitioner.

Charles A. Stacy, Esq. Bluefield, VA, for the Respondent.

1. The 2008 version of West Virginia Code § 17C–5A–2 is applicable to the instant case.

2. Based upon the record before the Court, this alleged error was not raised before the circuit court. "To preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect." Syl. Pt. 2, *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 470

S.E.2d 162 (1996); *see also* Syl. Pt. 6, *In re Michael Ray T.*, 206 W.Va. 434, 525 S.E.2d 315 (1999) (stating that "[t]he responsibility and burden of designating the record is on the parties, and appellate review must be limited to those issues which appear in the record presented to this Court."). Accordingly, this Court declines to address the issue as it was not properly raised nor preserved as error below.

tration to the Respondent, Senior Trooper Workman testified that he smelled alcohol. The trooper testified that the Respondent admitted to consuming a couple of beers. The Respondent failed the standardized field sobriety tests. The Respondent was administered a preliminary breath test that measured .119. Senior Trooper Workman placed the Respondent under arrest for driving under the influence.

The Division of Motor Vehicles ("DMV") received the West Virginia D.U.I. Information Sheet on December 31, 2008. The DMV then issued an order, dated January 16, 2009, revoking the Respondent's privilege to drive in West Virginia. The Respondent timely requested an administrative hearing, challenging the probable cause for the stop and the secondary chemical test, as reflected in a "Hearing Request Form" that was received by the DMV on January 27, 2009.[3]

On September 10, 2009, there was an administrative hearing regarding the Respondent's license revocation. Senior Trooper Workman testified about the vehicle equipment checkpoint. Senior Trooper Workman also testified that it was his understanding that this type of checkpoint could be done at any time and any location. He stated that they would typically check seat belts or lights, as well as registration, insurance and license. He further testified that every vehicle was to be checked. Senior Trooper Workman testified that he was not aware of

any departmental guidelines that required prior approval before conducting a vehicle equipment checkpoint. The trooper also stated that he was not aware of any need to get pre-approval regarding location or duration of the checkpoint before conducting this type of checkpoint. Finally, the trooper testified regarding the evidence he obtained as a result of the vehicle safety checkpoint that led to the arrest of the Respondent for driving under the influence.[4]

Following the administrative hearing, in an undated final order, the Commissioner of the DMV, based upon the preponderance of the evidence that the Respondent was driving a motor vehicle while under the influence of alcohol, revoked the Respondent's license for a period of ninety days pursuant to West Virginia Code §§ 17C–5A–2(j) (2008)[5] and –3(c)(5)(A) (2008)[6] and West Virginia Code § 17B–3–9 (2005).[7] On September 30, 2010, the Respondent filed an administrative appeal in the Circuit Court of Mercer County, West Virginia. By order entered that same day, the circuit court granted the Respondent's request for a stay of his driver's license revocation that was scheduled take effect on October 13, 2010.

On December 21, 2010, a hearing was held before the circuit court regarding the Respondent's driver's license revocation. A copy of the transcript from this hearing was not a part of the record on appeal.

3. West Virginia Code § 17C–5A–2(a) provides that

[u]pon the written request of a person whose license to operate a motor vehicle in this State has been revoked or suspended under the provision of section one [§ 17C–5A–1] of this article or section seven [§ 17C–5–7], article five of this chapter, the Commissioner of the Division of Motor Vehicles shall stay the imposition of the period of revocation or suspension and afford the person an opportunity to be heard.
W.Va.Code § 17C–5A–2(a).

4. At the time of the administrative license revocation hearing, the Respondent's counsel, who was representing him in both the criminal and the administrative proceedings, stated on the record that the criminal charge was still pending and had not been litigated yet.

5. West Virginia Code § 17C–5A–2(j) provides, in part, for a six-month revocation period upon a finding by a preponderance of the evidence that

"the person did drive a motor vehicle while under the influence of alcohol...." *Id.*

6. West Virginia Code § 17C–5A–3(c)(5)(A) provides that

[w]hen the period of revocation is six months, the license to operate a motor vehicle in this State shall not be reissued until: (i) At least ninety days have elapsed from the date of the initial revocation, during which time the revocation was actually in effect; (ii) the offender has successfully completed the program; (iii) all costs of the program and administration have been paid; and (iv) all costs assessed as a result of a revocation hearing have been paid[.]
*Id.*

7. West Virginia Code § 17B–3–9 (2005) generally provides that the DMV may not require, upon suspension or revocation of a license, that the license be surrendered to and retained by the DMV.

By Order entered January 31, 2011, the circuit court reversed the Commissioner's final order and reinstated the Respondent's driver's license. In its Order, the circuit court specifically stated that

> [t]he parties concurred that the only issue to decide in this case is whether the exclusionary rule applies in an administrative proceeding concerning the revocation of the Petitioner's license to drive a motor vehicle. The parties further agree that this issue ... has not been directly addressed by the West Virginia Supreme Court." [8]

(footnote added). In resolving this issue, the circuit court concluded, as a matter of law, that the vehicle equipment checkpoint was unconstitutional, in light of the Court's decision in *State v. Sigler*, 224 W.Va. 608, 687 S.E.2d 391 (2009).[9] The circuit court, in reversing the Commissioner's decision, then implicitly applied the exclusionary rule to the civil, administrative driver's license revocation proceeding to exclude the evidence the state trooper had seized as a result of the stop.

## II. Standard of Review

The Court's review of the circuit court's order in this case is set forth in syllabus point one of *Clower v. West Department of Motor Vehicles*, 223 W.Va. 535, 678 S.E.2d 41 (2009):

> " 'In cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*.' Syllabus point 2, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996)."

*See* Syl. Pt. 1, *Miller v. Chenoweth*, 229 W.Va. 114, 727 S.E.2d 658 (W.Va.2012).

## III. Argument

The issue before the Court is whether the exclusionary rule applies in a civil, administrative hearing [10] concerning the revocation or suspension of a driver's license.[11] The Commissioner argues that the circuit court

---

8. The Respondent argues that "[i]n review of the opinion of the circuit court, there is no mention or finding of the exclusion of evidence, ... or any other similar language suggesting the exclusionary rule was considered or applied." The Respondent's characterization of the circuit court's order is misguided at best. While there is no express conclusion of law that references the exclusionary rule, the circuit court does find that "the checkpoint was unconstitutional" and reverses the Commissioner's decision revoking the Respondent's license based upon that determination. Thus, implicit in the circuit court's ruling is that it applied the exclusionary rule to exclude the evidence of driving under the influence obtained by the state police as a result of the "unconstitutional" checkpoint. Moreover, in direct contradiction to the Respondent's statement that the circuit court does not mention the exclusionary rule, the circuit court states twice in its Order that the issue before it is whether the exclusionary rule applies in an administrative proceeding concerning the revocation of a motorist's license.

9. The *Sigler* decision will be discussed in greater detail *infra*. For ease of review, however, this Court held in syllabus point nine of *Sigler* that

> [s]uspicionless checkpoint roadblocks are constitutional in West Virginia only when conducted in a random and non-discriminatory manner within predetermined written operation guidelines which minimize the State's intrusion into

the freedom of the individual and which strictly limits the discretion vested in police officers at the scene.

*Id.* at 610, 687 S.E.2d at 394, Syl. Pt. 9.

10. *See Carte v. Cline*, 200 W.Va. 162, 167, 488 S.E.2d 437, 442 (1997) (stating that "[a]dministrative revocation hearings are civil in nature[ ]"); *see also Cain v. W. Va. Div. of Motor Vehicles*, 225 W.Va. 467, 473, 694 S.E.2d 309, 315 (2010) (stating that "[a]s we made clear in *Carte*, a license revocation proceeding is not a criminal proceeding but a civil proceeding subject to the Administrative Procedures Act[ ]").

11. The issue is one of first impression. The Court, however, recognized in dicta in *State ex rel. State Farm Fire & Casualty Co. v. Madden*, 192 W.Va. 155, 451 S.E.2d 721 (1994), that "the exclusionary rule is not usually extended to civil cases." *Id.* at 163 & n. 10, 451 S.E.2d at 729 & n. 10. Further, the Court has found that the exclusionary rule is inapplicable in a probation revocation proceeding. *See* Syl. Pt. 3, *Hughes v. Gwinn*, 170 W.Va. 87, 290 S.E.2d 5 (1982) ("Evidence obtained under circumstances which would be in violation of rights secured by *U.S. Const.*, Amend. IV and v. and our equivalent *W. Va. Const.*, Art. 3 § 5 and Art. 3 § 6 with regard to a person who is not on probation is still admissible in a probation revocation proceeding.").

erred in applying the prophylactic exclusionary rule to exclude all evidence in this case because the judicially-created exclusionary rule does not apply to civil proceedings. Conversely, the Respondent argues that the circuit court properly determined that the appropriate and effective remedy for a constitutional violation would be to exclude evidence stemming from an unconstitutional checkpoint conducted by law enforcement in an administrative, civil proceeding, as well as a criminal proceeding.

■■■ The exclusionary rule was created by the United States Supreme Court in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and is applied to prohibit the introduction of evidence obtained as a result of an illegal seizure conducted in violation of the Fourth Amendment to the United States Constitution. *See State v. Townsend*, 186 W.Va. 283, 286, 412 S.E.2d 477, 480 (1991) (" 'The general rule is that where there is an illegal seizure of property, such property cannot be introduced into evidence, and testimony may not be given in regard to the facts surrounding the seizure of the property.' ")(quoting Syl. Pt. 1, *State v. Davis*, 170 W.Va. 376, 294 S.E.2d 179 (1982)); *accord Miller*, 229 W.Va. at 118, 727 S.E.2d at 662. An understanding of the rationale behind the judicially-created exclusionary rule is necessary for resolution of whether the exclusionary rule should be extended to civil, administrative driver's license revocation or suspension proceedings. As the United States Supreme Court recently stated in *Davis v. United States*, —— U.S. ——, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011), "[t]he Fourth Amendment[12] protects the 'rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' The Amendment says nothing about suppressing evidence obtained in violation of this command." *Id.* at 2426 (footnote added). Thus, "[e]xclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury'

occasioned by an unconstitutional search." *Id.* (quoting *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)). Consequently, "[t]he rule's sole purpose ... is to deter future Fourth Amendment violations[,][13]" and "[w]here suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly ... unwarranted.' " 131 S.Ct. at 2426–27 (quoting, in part, *United States v. Janis*, 428 U.S. 433, 454, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976)). Thus, "because the rule is prudential rather than constitutionally mandated," the Supreme Court has determined that it is "applicable only where its deterrence benefits outweigh its 'substantial social costs.' " *Pa. Bd. of Prob. and Parole v. Scott*, 524 U.S. 357, 363, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998)(quoting, in part, *United States v. Leon*, 468 U.S. 897, 907, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)); *see Janis*, 428 U.S. at 454, 96 S.Ct. 3021 ("[E]xclusion from federal civil proceedings of evidence unlawfully seized by a state criminal enforcement officer has not been shown to have a sufficient likelihood of deterring the conduct of the state police so that it outweighs the societal costs imposed by the exclusion. This Court, therefore, is not justified in so extending the exclusionary rule.").

■■■ This Court has previously held that "[t]he purpose of this State's administrative driver's license revocation procedures is to protect innocent persons by removing intoxicated drivers from the public roadways as quickly as possible." Syl. Pt. 3, *In re Petition of McKinney*, 218 W.Va. 557, 625 S.E.2d 319 (2005). This purpose behind the administrative sanctions for driving under the influence set forth in West Virginia Code §§ 17–5A–1 to –4 (2009) would be thwarted if the exclusionary rule was applied in an administrative license revocation or suspension proceeding at a substantial cost to society. Other courts, likewise, have acknowledged this substantial cost of applying the exclusionary rule in a license revocation or suspension proceeding. For instance, in *Powell*

---

12. *See* U.S. Const. amend IV; *see also* W. Va. Const. art. III, § 6.

13. *See United States v. Janis*, 428 U.S. 433, 446, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976)(stating that "the 'prime purpose' of the [exclusionary] rule, if not the sole one, 'is to deter future unlawful police conduct[ ]' ")(quoting *United States. v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)).

*v. Secretary of State,* 614 A.2d 1303 (1992), the Supreme Judicial Court of Maine stated:

> Because the evidence has already been excluded from the criminal proceeding, there is little additional deterrent effect on police conduct by preventing consideration of the evidence by the hearing examiner. The costs to society resulting from excluding the evidence, on the other hand, would be substantial. The purpose of administrative license suspensions is to protect the public. *Thompson v. Edgar,* 259 A.2d 27, 30 (Me.1969). *Because of the great danger posed by persons operating motor vehicles while intoxicated, it is very much in the public interest that such persons be removed from our highways.*

614 A.2d at 1306–07 (emphasis added). Additionally,

> [a] license revocation hearing "is entirely separate and distinct from the proceeding to determine the guilt or innocence of the person as to the crime of DWI." *See State ex rel. Schwartz v. Kennedy,* 120 N.M. at 626 [619], 904 P.2d at 1051 [1044 (1995)] (internal quotation marks and citation omitted). The exclusionary rule excludes evidence of the illegal stop from the criminal DWI proceeding, thereby preventing the loss of the driver's liberty interest and deterring future police misconduct. The driver nonetheless loses his or her driver's license in order to temporarily remove the driver from the roads of the state if the police officer had reasonable grounds to believe the driver was DWI and if the other elements necessary for revocation are met. *The revocation serves to protect the public from a driver who has chosen either to refuse chemical testing or to ingest intoxicating alcohol or drugs before driving,* regardless of whether the initial traffic stop was valid or not.

*Glynn v. State, Taxation and Revenue Dep't, Motor Vehicle Div.,* 149 N.M. 518, 252 P.3d 742, 750 (Ct.App.), *cert. denied,* 150 N.M. 619, 264 P.3d 520 (2011) (emphasis added). Finally, in *Beller v. Rolfe,* 194 P.3d 949 (Utah 2008), the Supreme Court of Utah opined that

> [b]y keeping inebriated drivers off the roads, suspension and revocation proceedings serve the important policy function of disabling individuals who might put themselves and other citizens at risk. Such proceedings, which aim to protect rather than to punish, differ substantially from the objectives of the criminal law proscription against operating a motor vehicle while impaired.

*Id.* at 954.

Courts have found that applying the exclusionary rule in an administrative license revocation or suspension proceeding offers little deterrence for police misconduct. As the Supreme Court of Connecticut reasoned in *Fishbein v. Kozlowski,* 252 Conn. 38, 743 A.2d 1110 (1999):

> We conclude in this case that "the local law enforcement official is already 'punished' by the exclusion of the evidence in the state criminal trial. That, necessarily, is of substantial concern to him." *United States v. Janis,* supra, 428 U.S. at 448, 96 S.Ct. 3021. The exclusion of the evidence in the license suspension hearing would be of only incremental deterrent value. That value is substantially outweighed by the societal interest in having otherwise reliable evidence of probable cause to arrest for driving while intoxicated presented at the hearing....

> The plaintiff argues that, if a reasonable and articulable suspicion for the initial stop need not be demonstrated at the license suspension hearing, and if the exclusionary rule does not apply at the hearing, then the police will be encouraged to conduct arbitrary or discriminatory stops on the mere chance of subsequently establishing probable cause to arrest for driving while intoxicated. We are unpersuaded by this argument for the following reasons: First, the exclusion of any illegally obtained evidence in criminal proceedings, which are the police officer's primary zone of interest, provides a deterrent to such conduct. Second, we will not assume that the police will expend scarce law enforcement resources to stop motorists whom they have no articulable reason to suspect of any offense on the mere chance of establishing probable cause.

743 A.2d at 1119. Likewise, the Court of Appeals of Arizona reasoned in *Tornabene v. Bonine ex rel. Arizona Highway Department*, 203 Ariz. 326, 54 P.3d 355 (Ct.App. 2003), that

> When a law enforcement officer stops a motorist on suspicion of DUI, the officer's "primary interest" is most likely criminal prosecution, rather than the collateral consequence of license suspension. *Fishbein*, 743 A.2d at 1118–19. Because use in the license suspension hearing of evidence obtained through an improper stop "'falls outside the offending officer's zone of primary interest,'" exclusion of such evidence in that civil context would not significantly affect a police officer's motivation in conducting a vehicle stop. *Id., quoting Janis*, 428 U.S. at 458, 96 S.Ct. at 3034, 49 L.Ed.2d at 1063. The officer is "already 'punished' by the exclusion of the evidence in the state criminal trial[, which] necessarily, is of substantial concern to him [or her]." *Id.* at 1119, *quoting Janis*, 428 U.S. at 448, 96 S.Ct. at 3029, 49 L.Ed.2d at 1057.

*Tornabene*, 54 P.3d at 364–65.

■ This Court agrees that if the exclusionary rule is extended to civil license revocation or suspension proceedings there would be minimal likelihood of deterring police misconduct because the real punishment to law enforcement for misconduct is derived by excluding unlawfully seized evidence in the criminal proceeding. When this minimal deterrent benefit is compared to the societal cost of applying the exclusionary rule in a civil, administrative driver's license revocation or suspension proceeding that was designed to protect innocent persons, the cost to society outweighs any benefit of extending the exclusionary rule to the civil proceeding.

Furthermore, at the time the safety equipment checkpoint occurred in this case, the state troopers were acting lawfully under the decision of this Court in *State v. Davis*, 195 W.Va. 79, 464 S.E.2d 598 (1995), *overruled by State v. Sigler*, 224 W.Va. 608, 687 S.E.2d 391

(2009). In *Davis*, the Court was presented with a challenge to the constitutionality of a police roadblock that was set up to verify the possession and validity of driver's licenses, vehicle registration cards and mandatory insurance. *Id.* at 82, 464 S.E.2d at 601. The defendant argued that her motion to dismiss and motion to suppress in her criminal case of first offense driving under the influence of alcohol should have been granted because the roadblock which led to her arrest was an unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution and Article III, § 6 of the West Virginia Constitution. 195 W.Va. at 82, 464 S.E.2d at 601. The defendant was convicted of the crime of first offense driving under the influence. *Id.* at 80, 464 S.E.2d at 599. In that case, the Court affirmed the defendant's conviction determining that, contrary to the defendant's argument that the roadblock was a sobriety checkpoint, the roadblock was nothing more than a "routine road check." *Id.* at 84, 464 S.E.2d at 603. Thus, because the routine road check was not a sobriety checkpoint and, therefore, not governed by the more detailed scrutiny set forth by the Court in *Carte v. Cline*, 194 W.Va. 233, 460 S.E.2d 48 (1995),[14] the initial stop of a vehicle pursuant to a roadblock set up was lawful. *Id.* at 84, 464 S.E.2d at 603. Consequently, in *Davis*, because the initial stop was lawful, the officer's observations, which included the defendant's slurred speech and red eyes, the smell of alcohol, as well as the results of the horizontal gaze nystagmus test, provided sufficient evidence to support the defendant's arrest and criminal conviction for driving under the influence of alcohol. *Id.*

Almost a year after the safety equipment checkpoint that occurred in the instant case, the Court determined in *State v. Sigler*, 224 W.Va. 608, 687 S.E.2d 391 (2009), that the manner in which the checkpoint occurred in this case was no longer constitutional. Specifically, the Court "expressly overruled" its prior decision in *Davis*. *Sigler*, 224 W.Va. at 610, 687 S.E.2d at 393, Syl. Pt. 3. The Court further held in syllabus point nine of *Sigler*

14. In *Carte*, the Court held in syllabus point one that "[s]obriety checkpoint roadblocks are constitutional when conducted within predetermined operational guidelines which minimize the intru-

sion on the individual and mitigate the discretion vested in police officers at the scene." 194 W.Va. at 234, 460 S.E.2d at 49, Syl. Pt. 1.

that "[s]uspicionless checkpoint roadblocks are constitutional in West Virginia only when conducted in a random and non-discriminatory manner within predetermined written operation guidelines which minimize the State's intrusion into the freedom of the individual and which strictly limits the discretion vested in police officers at the scene." *Id.* at 610, 687 S.E.2d at 394, Syl. Pt. 9.

Recently, in *Davis,* the United States Supreme Court addressed the issue of whether to exclude evidence seized in a criminal case by the police acting under legal precedent that is later overruled. As the Supreme Court stated,

> "[t]he question here is whether to apply this sanction [referring to the exclusionary rule] when the police conduct a search in compliance with binding precedent that is later overruled. Because the suppression would do nothing to deter police misconduct in these circumstances, and because it would come at a high cost to both the truth and the public safety, we hold that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule.

131 S.Ct. at 2423–24. Thus, the Supreme Court refused to overturn a criminal conviction because "when binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities." *Id.* at 2429. "Indeed, in 27 years of practice under *Leon's* good faith exception, we have 'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." *Id.; see United States v. Robinson,* 2011 WL 6009839 (4th Cir.2011)(applying *Davis* and determining that good faith exception to exclusionary rule applied). Therefore, it logically follows that if the exclusionary rule does not act to prohibit introduction of evidence in a criminal matter when law enforcement officers are acting in good faith under binding appellate precedent then neither should the exclusionary rule be applied or extended to a civil, administrative driver's license revocation or suspension proceeding where police miscon-

duct is not at issue. Because the exclusionary rule is only meant to deter police misconduct, its application in the instant case would be completely unjustified.

A majority of jurisdictions that have already examined this issue have concluded that the exclusionary rule should not be extended to apply to civil, administrative driver's license revocation or suspension proceedings. *Nevers v. Alaska, Dep't of Admin., Div. of Motor Vehicles,* 123 P.3d 958, 964 (Alaska 2005) ("[W]e join the majority of jurisdictions and hold that the exclusionary rule is inapplicable to search and seizure violations in administrative license revocation hearings."); *Park v. Valverde,* 152 Cal. App.4th 877, 61 Cal.Rptr.3d 895, 902 (2007) (concluding that "the exclusionary rule is inapplicable to the DMV administrative proceedings" where motorist who was driving under the influence was stopped based on outdated police information indicating vehicle he was driving was stolen); *Martin v. Kan. Dep't of Revenue,* 285 Kan. 625, 176 P.3d 938, 952 (2008) (declining to apply exclusionary rule to license revocation proceedings, finding that "the reasoning and outcomes of the Arizona Court of Appeals and the majority of our sister states as more sound"); *Glynn,* 252 P.3d at 749 ("The majority of courts in other jurisdictions that have addressed this issue have concluded that the exclusionary rule does not apply in proceedings for the revocation of a driver's license."); *see Tornabene,* 54 P.3d at 365 (holding that "the exclusionary rule, although required to preserve and protect Fourth Amendment rights in the criminal context, should not be applied to civil license suspension hearings...."); *Fishbein,* 743 A.2d at 1117 (concluding that "failure to comply with the requirements for a criminal prosecution as they apply to investigatory stops should not prevent suspension of license of a person arrested upon probable cause to believe that he was operating under the influence of intoxicating liquor"); *Powell,* 614 A.2d at 1306 (concluding that "the fourth amendment's exclusionary rule should not be applied[,]" in an administrative license suspension proceeding); *Motor Vehicle Admin. v. Richards,* 356 Md. 356, 739 A.2d 58, 70 (1999) (determining that exclusionary rule did not apply in civil administrative driver's

license suspension proceeding); *Riche v. Dir. of Revenue*, 987 S.W.2d 331, 334–35 (Mo. 1999) (declining to apply exclusionary rule to administrative license suspension hearing to exclude evidence of intoxication even though evidence gathered after initial stop that was unsupported by probable cause); *Chase v. Neth*, 269 Neb. 882, 697 N.W.2d 675, 684 (2005) (refusing to apply exclusionary rule to administrative license revocation proceedings); *Lopez v. Dir., N.H. Div. of Motor Vehicles*, 145 N.H. 222, 761 A.2d 448, 451 (2000) (declining to apply exclusionary rule to administrative license revocation proceeding); *Beller*, 194 P.3d at 955 ("[W]e hold that the exclusionary rule does not apply to driver license revocation proceedings."); *see also Janis*, 428 U.S. at 447, 96 S.Ct. 3021 (stating that "[i]n the complex and turbulent history of the rule, the Court never has applied it to exclude evidence from a civil proceeding, federal or state.").[15]

Therefore, we join the sound reasoning of the majority of other jurisdictions that have examined the application of the exclusionary rule in the context of civil, administrative license revocation proceedings in holding that the judicially-created exclusionary rule is not applicable in a civil, administrative driver's license revocation or suspension proceeding.

## IV. Conclusion

Based upon the foregoing, the decision of the Circuit Court of Mercer County, West Virginia, is reversed, and the case is remanded for entry of an order that comports with the decision of the Court.

Reversed and remanded.

KETCHUM, Chief Justice, dissenting:

A police traffic stop constitutes the seizure of a person. It is a seizure even if the police officer does not issue a ticket or if the stop only leads to a ticket with a possible penalty to be assessed in a civil or administrative proceeding. The Fourth Amendment applies to all governmental actions. Its protections apply to all people, not just criminal defendants or criminal investigations.[1]

Where there has been an unlawful traffic stop, the majority now allows the use of any evidence unlawfully obtained in the unlawful traffic stop (seizure) in an administrative hearing to revoke a person's drivers license. The majority allows evidence obtained during an unlawful stop to be used at an administrative hearing because the hearing is civil in nature rather than criminal. The police are now allowed to make investigatory stops based on hunches, or for no reason at all, knowing that the evidence obtained in violation of the Fourth Amendment can still be used to administratively revoke a person's drivers license.

As a result of the majority opinion, we now have a dual standard for vehicle stops by police in West Virginia. If criminal DUI charges are pursued, the officer must have

---

**15.** Of the jurisdictions examined by the Court that have extended the application of the exclusionary rule to civil license revocation or suspension proceedings, only one expressly addressed the exclusionary rule. *State v. Lussier*, 171 Vt. 19, 757 A.2d 1017, 1026–27 (2000) ("[W]e conclude that it is appropriate to apply the exclusionary rule in civil license suspension proceedings to protect the core value of privacy embraced in Article 11, to promote the public's trust in the judicial system, and to assure that unlawful police conduct is not encouraged."). The other jurisdictions in the minority have either implicitly applied the rule or expressly declined to address the exclusionary rule. *See People v. Krueger*, 208 Ill.App.3d 897, 153 Ill.Dec. 759, 567 N.E.2d 717, 723, *appeal denied*, 141 Ill.2d 552, 162 Ill.Dec. 500, 580 N.E.2d 126 (1991) (construing Illinois statute to condition power to suspend driver's license on presence of valid arrest and specifically limiting holding "on the construction of the statute that we have put forth rather than on the application of the exclusionary rule as such[]'"); *Olson v. Comm'r of Pub. Safety*, 371 N.W.2d 552, 556 (Minn.1985) (implicitly applying exclusionary rule where police lacked reliable evidence necessary for investigative stop); *Watford v. Bureau of Motor Vehicles*, 110 Ohio App.3d 499, 674 N.E.2d 776, 779 (1996) (implicitly applying exclusionary rule where police officer's initial stop of vehicle found unlawful); *Pooler v. Motor Vehicles Div.*, 306 Or. 47, 755 P.2d 701, 703–04 (1988) (concluding that administrative hearing officer must determine validity of arrest in driving under the influence license revocation proceeding and because state conceded that arrest was unlawful, evidence obtained from stop was excluded).

**1.** *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

had an "articulable reasonable suspicion" [2] to stop the motorist or the evidence obtained is not admissible in court. However, under the majority opinion, an officer is not required to set forth an "articulable reasonable suspicion" for stopping a motorist in an administrative hearing which could result in the civil suspension of a motorist's drivers license.

This dual standard is confusing and unnecessary. A single standard requiring an officer to articulate a reasonable suspicion for stopping a motorist, regardless of whether the stop leads to a criminal or civil sanction, would provide a clear and enforceable bright line rule for all police officers to follow, that would result in the uniform application of our laws. The dual standard set forth by the majority creates a nebulous distinction between lawful and unlawful stops that will result in confusion and an inconsistent application of our laws.

Our citizens should be free of any vehicle stops by the police unless the officer has an "articulable reasonable suspicion" that the motorist is violating the law. I, too, want intoxicated drivers off the road. However, police should only be able to stop motorists based on an "articulable reasonable suspicion" of a suspected violation, rather than on a hunch or for no reason at all.

BENJAMIN, J., dissenting:

(Filed July 20, 2012)

I am deeply troubled that, in legitimizing the Executive Branch's use of unlawfully gathered evidence herein, the Majority makes this Court complicit in the improper *and* unconstitutional acts of Executive Branch officials. By embracing its "end justifies the means" test for whether a constitutionally recognized right is or is not to be protected by this Court, the Majority effectively surrenders to the Executive Branch this Court's constitutional prerogative (and duty) to limit the search and seizure power of the Executive Branch. Specifically, the Majority empowers the Executive Branch itself to define its own constitutional limitations by focusing not on the propriety of the acts of the Executive Branch in its gathering of evidence, but rather on how one arm of the Executive Branch wishes to use the fruits of an unconstitutional search and seizure committed by another arm of the Executive Branch. A stop which leads to a license forfeiture in West Virginia now needs not be lawful.

Furthermore, the majority opinion effectively, without apparent serious consideration, reads into our statutory law a legislative intent to permit unlawful searches and seizures to serve as a primary and proper evidentiary basis for license revocations. The Majority apparently presumes that the same Legislative Branch which was so careful to protect the *procedural* rights of West Virginians in license revocation matters by enacting extensive statutory protections for such citizens somehow missed protecting the *search and seizure* rights of the same West Virginians.[1]

---

**2.** "Police officers may stop a vehicle to investigate if they have an articulable reasonable suspicion that the vehicle is subject to seizure or a person in the vehicle has committed, is committing, or is about to commit a crime[.]" Syllabus Point 1, in part, *State v. Stuart*, 192 W.Va. 428, 452 S.E.2d 886 (1994).

**1.** As of June 11, 2010, the Office of Administrative Hearings assumed responsibility for license revocation hearings pursuant to W. Va.Code §§ 17C–5C–1 to –5 (2010). At the same time, an amendment to § 17C–5A–2(f) changed the required factual determinations to be made at revocation hearings to

(1) Whether the investigating law-enforcement officer had reasonable grounds to believe the person to have been driving while under the

influence of alcohol, controlled substances or drugs . . .; (2) *whether the person was lawfully placed under arrest* for an offense involving driving under the influence of alcohol . . ., or was lawfully taken into custody for the purpose of administering a second test . . .; (3) whether the person committed an offense involving driving under the influence of alcohol . . ., or was lawfully taken into custody for the purpose of administering a second test; and (4) whether the tests, if any, were administered in accordance with the provisions of this article and article five [§§ 17C–5–1 et seq.] of this chapter. (Emphasis added). The changes to the statute evidence the Legislature's resolve that unlawful searches and seizures not serve as the basis for either criminal *or* non-criminal prosecutions by the Executive Branch.

Our statutory law is clear with respect to evidence of the alleged operation of a motor vehicle while intoxicated. Evidence from an investigation involving DUI must be sent to the Division of Motor Vehicles, and that arm of the Executive Branch must act upon such information. W. Va.Code § 17C–5A–1 (2008). There is therefore no dispute that the evidence unlawfully gathered herein would be used *both* for a criminal and a quasi-criminal (license forfeiture) purpose *and* that the primary evidentiary foundation for both criminal and non-criminal prosecutions would be the same Executive Branch agent who initiated the improper search and seizure. To claim that a primary motivating basis for the unlawful search and seizure herein was not a non-criminal prosecution begs belief—and the facts.

In advancing a "balancing" basis for its decision, the Majority accepts at face value the "safety" contentions of the State related to its desired use of the unlawfully obtained evidence herein. Seeking to enhance the safety of our roads is an exceedingly important goal—a point no doubt as paramount to law enforcement agents as is the enforcement by such agents of criminal traffic laws. The commonly heard term, "serve and protect," underscores this dual role that law enforcement has to not only enforce criminal laws, but also to protect. Indeed, it is our expectation of law enforcement—so long as law enforcement operates within the parameters of individual constitutional rights—to enforce *both* the criminal *and* the non-criminal DUI-related law of West Virginia.[2]

The unlawful stop herein was not at a properly constituted "DUI checkpoint" primarily designed for identifying drivers in violation of criminal traffic laws, but rather at something akin to a "safety checkpoint." The State's purported motivating basis for the search and seizure was non-criminal; i.e., safety-related. This fact underscores a failure of simple logic in the majority opinion. All agree that a search initiated for the enforcement of our criminal laws (such as a "DUI checkpoint") must meet constitutional muster to be used in a later criminal prosecution by the Executive Branch. Common sense and basic legal reasoning likewise compel the conclusion that a search initiated for non-criminal purposes by the Executive Branch (such as a so-called "safety checkpoint") must meet constitutional muster to be used in a later non-criminal prosecution by the Executive Branch.

How then does the Majority justify the results of its "balancing" argument? Lacking supporting empirical data and overlooking the compelling separation of powers issues herein, the majority opinion settles on safety. It concludes that the exclusion of unlawfully gathered evidence will not significantly deter similar unlawful conduct in the future and, therefore, the desire for safety is sufficient to overlook how the evidence was obtained. On a visceral level, this is an exceedingly persuasive argument. No sensible person wants drunk drivers on the roads we use. In view of the horrific consequences of drunk driving on our society, there may be no stronger desire that we may have than to try to keep such drivers off the roads. But, as tough as it may be in this case, a court's duty is not to decide tough issues on a visceral basis or on a situational basis. It is our duty to decide tough emotional issues within the framework of our constitutional limita-

---

2. The conduct challenged herein fits squarely, both criminally and non-criminally, within "the offending officer's zone of primary interest." *I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 1053, 104 S.Ct. 3479, 3491, 82 L.Ed.2d 778 (1984) (White, J., dissenting) (quoting *United States v. Janis,* 428 U.S. 433, 458, 96 S.Ct. 3021, 3034, 49 L.Ed.2d 1046 (1976)). West Virginia relies on law enforcement officers to perform *dual* criminal and non-criminal roles in executing their law enforcement duties. I see no reason why a police officer would not place equal emphasis on the goals of both criminal or civil proceedings. In fact, I could easily see how a police officer might place more emphasis on removing drunk drivers from the roadways through a license revocation proceeding where criminal proceedings may only result in a fine. *See* W. Va.Code § 17C–5–2 (2010). Further, as a witness, the officer serves as the primary evidentiary foundation for introduction of seized information in *both* criminal and non-criminal proceedings in West Virginia. To assert that the exclusion of unlawfully-obtained evidence in criminal proceedings sufficiently deters future unlawful acts, but that exclusion of unlawfully-obtained evidence in non-criminal proceedings does not significantly deter future unlawful acts is nonsensical.

tions and the effect which our precedent may have in other cases raising the same legal issues. In this regard, the majority opinion is, though emotionally compelling, constitutionally deficient.[3]

The language of the Fourth Amendment to the United States Constitution and the Search and Seizure Clause of the West Virginia Constitution is almost identical. Article 3, Section 6 of our state constitution provides, in part, "The rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and seizures, *shall not* be violated." (Emphasis added).[4] The logic of the majority opinion fails when viewed against this language. The Fourth Amendment and Article 3, Section 6 of our state constitution were designed to shield citizens from unbridled police power, not to facilitate government programs or operations. No power of government, short of arrest and incarceration, has such a direct impact on the life, liberty, and property of individual citizens.

By their express terms, neither constitution provision limits their protections simply to criminal matters or to criminal prosecutions by the State. The Fourth Amendment's protections, and those of the West Virginia constitution, are plenary. Both constitutional provisions manifest a preference for a procedure of antecedent justification that law enforcement must follow before it may legitimately invade the privacy of citizens. The people's fundamental rights are to

be protected without any limitation as to either the State's claimed purpose for a search or the State's intended use for what is seized from the citizen. In other words, "use" is not determinative of the existence of the right to be protected. Unlawful actions do not become acceptable simply because of how the State later wishes to benefit from its misconduct. Unlawful means unlawful.

The exclusionary rule, which is judicially created, evolved as a mechanism to prevent abuse of citizens' rights. It was first adopted in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and it was extended to the several states in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). It is a logical and necessary corollary to the principle of antecedent justification inherent in the Fourth Amendment and Article 3, Section 6 of our state constitution. Since the state should not benefit from the illegal acts of its police force, the exclusionary rule serves as a deterrent to state actors who may violate citizen's rights. *See Mapp,* 367 U.S. at 648, 81 S.Ct. 1684. It also preserves the legitimacy of the judicial process and avoids the courts becoming tainted by the misdeeds of the Executive Branch.[5]

The majority opinion's reliance on a balancing test related to deterrence is unconvincing. The Majority does not reference empirical data to support is conclusions. Such data strongly supports extending the exclusionary rule herein. Based upon his studies, Professor Milton Loewenthal found

**3.** I want to emphasize that in no way through this dissent do I intend to lessen the gravity of the great harm and danger drunk drivers pose to the people of West Virginia. I firmly believe that there is a "very valid public policy concern to rid our highways of drunken drivers" and that the government has a strong interest in doing just that. *Fishbein v. Kozlowski,* 252 Conn. 38, 743 A.2d 1110, 1126 (1999) (Norcott, J., dissenting). While the goal of eliminating drunk drivers from our roadways is an admirable one, the goal should not be achieved by subjecting our citizens to the violation of their constitutional rights.

Likewise, I do not through this dissent intend to disrespect the important and often difficult efforts of our law enforcement personnel. There is no assertion herein that the officers in question deliberately sought to violate the constitutional rights of the driver. The enforcement of individual constitutional rights does no more disservice

to law enforcement officers than does the existence of the rights themselves.

**4.** The Fourth Amendment to the United States Constitution declares, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."

**5.** Justice Brennan noted that this purpose for the exclusionary rule was recognized with the adoption of the exclusionary rule in *Weeks* until the Court decided *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974): The exclusionary rule "enabl[es] the judiciary to avoid the taint of partnership in official lawlessness." *Calandra,* 414 U.S. at 357, 94 S.Ct. 613 (Brennan, J., dissenting). When the majority decided *Calandra,* it stated only that the rule's "purpose is to deter." *Calandra,* 414 U.S. at 347, 94 S.Ct. 613.

that there is "strong evidence that, regardless of the effectiveness of direct sanctions, police officers could neither understand nor respect a Court which purported to impose constitutional standards on the police without excluding evidence obtained in violation of those standards." Milton A. Loewenthal, *Evaluating the Exclusionary Rule in Search and Seizure*, 49 UMKC L.Rev. 24, 29 (1980). He also found that the police "have great difficulty believing that standards can have any real meaning if the government can profit from violating them." *Id.* at 39.

The "ends justifies the means" precedent now adopted by the Majority opens the door to troubling scenarios. For traffic stops, is mere suspicion rather than probable cause now a proper basis for stopping a driver so long as the State uses the fruits of such a stop outside the criminal arena? Has subjectivity replaced objectivity with respect to search and seizure protections? Indeed, is *any* reason now needed for a search and seizure so long as the State can articulate a compelling emotional argument for the use of such illegally obtained evidence in a non-criminal proceeding? Are improper bases for State action, such as profiling and stereotyping, now to be excused so long as the evidence seized is not used in a criminal prosecution and the State claims "safety" or another compelling emotional or societal basis as its justification? Removing an objectively-based rationale for a search and seizure, so long as the State can thereafter erect a compelling societal "need" for its actions, squarely places our jurisprudence on a decidedly slippery slope.

Questions abound. Perhaps the State should now be permitted to use the fruits of unlawful searches of personal vehicles, cell phones, desks, lockers, computers, homes, apartments, places of employment, etc., in non-DUI scenarios? So long as the State can later articulate a significant safety or societal basis for using the fruits of its illegal activities, does the Majority's holding now permit the State to use evidence illegally obtained in a criminal tax investigation to prosecute an individual in a non-criminal tax penalty or forfeiture proceeding? Arguably it does. Does the Majority's holding now permit the State in a discharge proceeding unrelated to sexual misconduct to nevertheless use evidence obtained from the State's illegal search of a teacher's computer, locker, office, car or home where the motivation for the search was no more than an incorrect subjective "hunch" by an agent of the State that the teacher *might* be a criminal threat to his or her infant pupils? Again, arguably it does.

The majority opinion suggests that the exclusionary rule does not apply in non-criminal settings. This is incorrect. The United States Supreme Court itself has specifically extended the exclusionary rule to "quasi-criminal" property forfeiture proceedings. *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965).[6] Eleven of the thirteen federal Circuit Courts of Appeals have interpreted *Plymouth Sedan* to stand for the proposition that the exclusionary rule applies to civil *in rem* forfeiture proceedings. Courts in thirty-four states agree.

The exclusionary rule has furthermore been applied in a myriad of other non-criminal settings. *See, e.g., Knoll Assocs., Inc. v.*

---

6. "A driver's license is a property interest and such interest is entitled to protection under the Due Process Clause of the West Virginia Constitution." Syl. Pt. 1, *Abshire v. Cline*, 193 W.Va. 180, 455 S.E.2d 549 (1995). *See also* Syl. Pt. 2, *Petry v. Stump*, 219 W.Va. 197, 632 S.E.2d 353 (2006). "There is not much question that in our mobile society the suspension of a driver's license ... constitutes a serious deprivation. It may have a direct impact on the licensee's employment if his job is dependent on the use of a driver's license." *Jordan v. Roberts*, 161 W.Va. 750, 756, 246 S.E.2d 259, 262–63 (1978). It is anomalous to exclude unlawful evidence in a criminal but not a forfeiture proceeding where the forfeiture relies on the same basis as a prosecution for the violation of criminal law. Here, the forfeiture proceeding was not collateral to the criminal proceeding. Even if one argues, unconvincing, that a license forfeiture was not a primary motivating rationale for the unlawful search and seizure herein, the forfeiture "proof" was inextricably connected with the criminal "proof" that the driver drove under the influence. Furthermore, it is the testimony of the officer whose stop was improper which serves as the necessary foundational predicate for both prosecutions. The majority opinion simply overlooks *Plymouth Sedan*.

*F. T. C.*, 397 F.2d 530 (7th Cir.1968) (FTC hearings to uncover discriminatory practices); *OKC Corp. v. Williams*, 461 F.Supp. 540 (N.D.Tex.1978), *judgment aff'd*, 614 F.2d 58 (5th Cir.1980) (SEC proceedings); *Savina Home Indus., Inc. v. Sec'y of Labor*, 594 F.2d 1358 (10th Cir.1979) (OSHA proceedings); *Goldin v. Pub. Utils. Comm'n*, 23 Cal.3d 638, 153 Cal.Rptr. 802, 592 P.2d 289 (1979) (proceedings before the public utilities commission to terminate phone service because of illegal use); *NLRB v. Bell Oil & Gas Co.*, 98 F.2d 870 (5th Cir.1938) (labor controversies); *Sullivan v. District Ct. of Hampshire*, 384 Mass. 736, 429 N.E.2d 335 (1981) (hearings to terminate a public employee); *Yarbrough v. Pfeiffer*, 370 So.2d 1177 (Fla.Dist.Ct.App. 1979) (professional license revocation); *Bd. of License Comm'rs v. Pastore*, 463 A.2d 161 (R.I.1983) (liquor license revocation); *Smyth v. Lubbers*, 398 F.Supp. 777 (W.D.Mich.1975) (student expulsion hearings).[7]

Another suggestion is that the threat of civil suits against police misconduct would be enough to deter the same. A civil suit of this sort would be costly. Moreover, a citizen's

success with such a remedy is far from certain and it could take years to secure any compensation or vindication for such unlawful acts.

I am cognizant that the exclusionary rule is a judicially-created evidentiary tool to enforce the protections afforded by our federal and state constitutions. I am also aware that some use this fact as a basis to argue against the legitimacy of the exclusionary rule. It is true, that the "exclusionary rule" does not appear in the Fourth Amendment. However, this argument is unconvincing. It is likewise true that the express terms of the Fourth Amendment do *not* limit the protections afforded therein to criminal applications only. Furthermore, such an argument ignores the fact that the other fundamental rights recognized in our Bill of Rights do not have explicit enforcement mechanisms. Rather, our state and federal constitutions leave to our Judicial Branch the duty to use such mechanisms as are necessary to enforce the simple terms of the protection recognized therein. Thus, it falls to the courts to develop enforcement mechanisms to ensure public

---

**7.** The majority opinion seeks justification for its holding by looking to other states. Although most other states have revocation proceedings different from that used in West Virginia, the majority is correct that fewer states exclude than do not. *See, e.g., Nevers v. State*, 123 P.3d 958, 963 (Alaska 2005) (Alaska); *Tornabene v. Bonine*, 203 Ariz. 326, 54 P.3d 355 (2002) (Arizona); *Gikas v. Zolin*, 6 Cal.4th 841, 25 Cal.Rptr.2d 500, 863 P.2d 745 (1993) (California); *Fishbein v. Kozlowski*, 252 Conn. 38, 743 A.2d 1110 (1999) (Connecticut); *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 176 P.3d 938 (2008) (Kansas); *Powell v. Sec'y of State*, 614 A.2d 1303 (Me.1992) (Maine); *Chase v. Neth*, 269 Neb. 882, 697 N.W.2d 675 (2005) (Nebraska); *Beavers v. State*, 109 Nev. 435, 851 P.2d 432 (1993) (Nevada); *Jacobs v. Dir., N.H. Div. of Motor Vehicles*, 149 N.H. 502, 823 A.2d 752 (2003) (New Hampshire); *Commonwealth v. Wysocki*, 517 Pa. 175, 535 A.2d 77, 79 (1987)(Pennsylvania); *State v. Brabson*, 976 S.W.2d 182 (Tex.Crim.App.1998) (Texas).

In dissenting to the majority in *Wysocki*, Justice Papadakos observed:
The majority opinion compels a conclusion that a police officer can stop anyone, anyplace, anytime of the day or night, *for no articulable reason at all*, and *then* form a reasonable belief that the person so stopped ... has been driving while under the influence of alcohol in violation of [statute].

*Wysocki*, 535 A.2d at 80 (Papadakos, J., dissenting) (emphasis in original). A number of states agree with such cogent reasoning, and apply the exclusion rule to revocation proceedings in some form or another. *See, e.g., People v. Krueger*, 208 Ill.App.3d 897, 153 Ill.Dec. 759, 567 N.E.2d 717, 725 (1991) (Illinois) (holding that where the license revocation statute requires a finding of an arrest; if the arrest is not lawful, the exclusionary rule applies); *Brownsberger v. Dep't of Transp.*, 460 N.W.2d 449, 450–51 (Iowa 1990) (Iowa) (if in the related criminal proceeding a conviction for driving under the influence of alcohol cannot be obtained, the DOT may not then revoke a driver's license in a civil proceeding arising from the same circumstances as the criminal proceeding); *Piotrowski v. Comm'r of Pub. Safety*, 453 N.W.2d 689 (Minn.1990) (Minnesota) (exclusionary rule applies in license revocation proceeding); *Armstrong v. State*, 245 Mont. 420, 800 P.2d 172, 173–74 (1990) (Montana) (holding that evidence of illegally driving under the influence of alcohol must be excluded if the initial stop by an arresting officer violates the driver's search or seizure rights); *Watford v. Bureau of Motor Vehicles*, 110 Ohio App.3d 499, 674 N.E.2d 776 (1996) (Ohio) (a "lawful arrest, including a constitutional stop" required before a refusal to take a test could trigger a license suspension); *State v. Lussier*, 171 Vt. 19, 757 A.2d 1017, 1025–27 (2000) (Vermont) (holding that the exclusionary rule applies to civil license revocation hearings).

and speedy trials despite the fact the Sixth Amendment is devoid of any express enforcement mechanisms. The same is true with respect to protections against Double Jeopardy under the Fifth Amendment and with respect to excessive fines under the Eighth Amendment.

Ultimately, the majority opinion herein severely compromises the constitutional integrity not only of the non-criminal revocation process herein, but also the integrity of our judicial process. The majority's reliance solely on a conclusory "lack of deterrence" rationale, which a critical review herein shows to be dubious, robs the Fourth Amendment and Article 3, Section 6 of the Constitution of West Virginia of their full protections—protections expressly not limited only to criminal rights—and thus robs the judicial process of its full legitimacy. A judicial system which accepts evidence without regard to the manner in which such evidence was obtained fails in its most primary obligation: to do justice under our state and federal constitutions. I therefore dissent.